IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JESSICA MOUNCE, Individually,
and on Behalf of All Others Similarly Situated                               PLAINTIFF

V.                              Case No. 5:15-CV-05197

CHSPSC, LLC; NORTHWEST ARKANSAS
HOSPITALS, LLC d/b/a NORTHWEST MEDICAL CENTER;
PROFESSIONAL ACCOUNT SERVICES, INC.; and
JOHN DOES I-X                                                              DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Currently before the Court are Defendants CHSPSC, LLC, Northwest Arkansas Hospitals, LLC, and Professional Account Services, Inc.'s Motion to Compel Arbitration (Doc. 27) and Brief in Support (Doc. 28); Plaintiff Jessica Mounce's Response in Opposition (Doc. 29); and Defendants' Reply (Doc. 31). The Court entertained oral argument on the Motion at a hearing that took place on November 3, 2015. After careful consideration of the issues, and as further explained herein, the Motion to Compel Arbitration is **DENIED**.

### I. BACKGROUND

Plaintiff Mounce, on behalf of an Arkansas class of persons similarly situated, filed a lawsuit in Washington County Circuit Court on June 3, 2015 (Doc. 3), alleging violations of the Arkansas Deceptive Trade Practices Act ("ADTPA") and claims for tortious interference, unjust enrichment, and injunctive relief against Defendant Northwest Arkansas Hospitals, LLC d/b/a Northwest Medical Center ("the Hospitals"); and Defendants CHSPSC, LLC and Professional Account Services, LLC ("the Billing Defendants"). The

-1-

Billing Defendants are, according to Mounce, two companies that exercise control over the Hospitals' policies related to billing and medical liens. The case was removed to this Court on August 18, 2015, and the parties concede that federal jurisdiction is proper pursuant to the Class Action Fairness Act of 2005.

Mounce contends that Defendants are jointly and severally liable to her and the members of her purported class for damages. According to the Complaint, the Hospitals, working in concert with the Billing Defendants, screen all patients and make determinations regarding the reasons for treatment and whether there may be sources of payment available other than health insurance. Then, if a patient is identified as one whose medical bills may be recoverable from another source, Defendants either: (1) refuse to submit that patient's bills to his or her health insurance carrier and instead impose a medical lien on proceeds recoverable from another source, or (2) submit the bills to the health insurer as well as another source, and when the other source pays the bills, remit the health insurer's payment back to the health insurer.

Mounce argues that Defendants are "contractually required to submit said bills to the health insurance carrier, accept the payment from health insurance in satisfaction of the bills, not seek payments from any additional sources, and hold the patient harmless from any amounts owed other than co-pays or deductibles." (Doc. 3, p. 5). Mounce also explains that health insurance providers pay bills at a discount—and that the discount is negotiated in contracts called provider agreements.

Defendants maintain that Mounce has no right to enforce the provider agreement (Doc. 27-4) that exists between her health insurer, Blue Cross Blue Shield ("Blue Cross"), and the hospital where she sought treatment, because that contract expressly states that

there is no intent for the agreement to benefit any third party, including a patient. Defendants also dispute that the provider agreements require them to submit medical bills to health insurers first instead of attempting to obtain payments directly from "other sources," including from personal injury settlements between patients and third-party insurance carriers. Defendants assert the affirmative defense of waiver, as Mounce voluntarily paid off the allegedly wrongful lien rather than contesting its validity, and Defendants also contend that Mounce asked her hospital not to submit her bill to Blue Cross before she had the opportunity to pursue a remedy from the third-party tortfeasor who was at fault for her injuries.

In the Motion to Compel Arbitration, Defendants argue that Mounce's true aim in filing her Complaint is to obtain benefits for herself through the enforcement of the provider agreement between Blue Cross and Defendants. Accordingly, Defendants believe Mounce should be considered a third-party beneficiary under the agreement and be bound by the agreement's terms—including the agreement's arbitration clause. The reasoning here is that Mounce's case cannot be decided independently of the provider agreement, and, but for the existence of that agreement, Defendants would not be asked "to forego payment from liable third parties and instead seek it only from the health insurer." (Defendants' Reply, Doc. 31, p. 1). In Defendants' view, since the provider agreement requires that disputes concerning the agreement be arbitrated, Mounce's entire lawsuit should be sent to arbitration and the case stayed until the conclusion of that process. Mounce disagrees with Defendants' position and desires that her lawsuit proceed in federal court.

The arbitration provision of the provider agreement states in relevant part:

In the event of *a dispute between the parties to this Agreement* concerning

> the terms, conditions, performance or non-performance, interpretation, construction or application of this Agreement, or any issue relating thereto, including but not limited to any dispute concerning a PHO Provider's credentials, qualifications, PPQ Network participation status, or payment, denial or processing of any claim(s), PHO and PHO Providers agree to negotiate in good faith in an effort to resolve the dispute without the necessity of any formal proceeding. If negotiations fail, or if any party declines for any reason to participate in negotiations, *the dispute shall be submitted to binding arbitration upon written request of any party.*

(Doc. 27-4, pp. 17-18) (emphasis added).

Even though this arbitration provision contemplates binding only the signatories to the agreement, Defendants ask that the Court bind Mounce, a non-signatory, by applying a theory called "direct benefits estoppel." According to this theory, when a non-signatory to an agreement directly benefits from the enforcement of the agreement, the non-signatory may be bound by the agreement's terms in certain circumstances. Defendants concede that Arkansas courts have only applied the direct benefits estoppel theory to compel *a signatory* to arbitration at the request of a non-signatory. No Arkansas court has used direct benefits estoppel as a means of binding an unwilling non-signatory to the terms of a contract, at a signatory's request.

Defendants also contend that the arbitration clause at issue here should be considered a "broad" clause, and thus interpreted liberally in favor of compelling arbitration, since it purports to cover any "dispute between the parties to this Agreement concerning the terms, conditions, performance or non-performance, interpretation, construction or application of this Agreement *or any issue related thereto*." *Id.* at p. 17 (emphasis added).

Mounce responds that the provider agreement expressly denies her, as a third party beneficiary/patient, the right to specific performance under the contract; and thus, she cannot be bound to the arbitration provision in the agreement under a direct benefits

-4-

estoppel theory. As to this point, the provider agreement states that:

> Unless explicitly provided in this Agreement, *there is no intent by either party to create or establish third party beneficiary status or rights as to any patient* . . . and no such other party shall have any right to enforce any right or enjoy any benefit created or established under this Agreement, except as expressly set forth herein.

(Doc. 27-4, p. 17) (emphasis added).

In addition to the plain language of the agreement, Mounce argues that in order for the doctrine of direct benefits estoppel to apply, the party estopped must have had actual knowledge of the arbitration agreement, and/or the entire case must "hinge upon" the enforcement of the contract containing the arbitration clause. (Doc. 29, p. 2). Mounce maintains she did not know about the existence of the provider agreement until she filed suit. She also maintains that, despite the fact that her Complaint references the provider agreement multiple times, her case does not hinge upon the enforcement of the agreement, as she asserts only non-contract claims against Defendant.

Below the Court will consider the legal standards that are appropriate in deciding a motion to compel arbitration, followed by an analysis of each party's position.

## II. LEGAL STANDARD

Although the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, which governs the arbitration clause in the provider agreement here, reflects a "liberal federal policy favoring arbitration," *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1745 (2011), the general rule is that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960) (internal marks

omitted)).

Ordinarily, "[a] court must grant a motion to compel arbitration if a valid arbitration clause exists which encompasses the dispute between the parties." *3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1199 (8th Cir. 2008). In the case at bar, however, Mounce is not a party to the provider agreement. The Motion to Compel arbitration is instead based on an equitable theory, rather than a legal theory, in which the Court is asked to determine whether a signatory to an agreement may enforce the arbitration provision contained in that agreement against a non-signatory, due to the nature of the relief the non-signatory has requested in a pending lawsuit.

The Eighth Circuit in *Reid v. Doe Run Resources Corp.*, interpreting Missouri law, acknowledged that a willing signatory to an arbitration agreement may possibly bind an unwilling non-signatory if one of five conditions is present: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, or (5) estoppel. 701 F.3d 840, 846 (8th Cir. 2012) (citing *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)). It is the "estoppel" condition that Defendants in the case at bar have identified in the Motion to Compel, as they argue that the nature of Mounce's lawsuit against them evidences her intent to seek a benefit under the agreement, and therefore, she should be estopped from denying she is bound by the arbitration provision of that agreement.

"State contract law determines which claims are enforceable under § 3 [of the FAA]." *Id.* (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009)). It follows, therefore, that this Court would look to Arkansas contract law, which controls the claims at issue here, to determine whether the direct benefits estoppel theory Defendants have

articulated has been recognized in Arkansas as a means to bind non-signatories to arbitration agreements. After some investigation, the Court agrees with the parties that no Arkansas court has weighed in on this particular issue, and it thus remains unresolved whether Arkansas would, if pressed, ascribe to such a theory to bind an unwilling non-signatory. Without clear guidance from Arkansas courts on this issue, the Court "must attempt to predict how the highest [state] court would resolve the issue, with decisions of intermediate state courts being persuasive authority." *Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010).

There is apparently a single Arkansas case, which Mounce has cited in her brief, *Bigge Crane & Rigging Co. v. Entergy Ark., Inc.*, 2015 Ark. 58 (2015), that analyzes the direct benefits estoppel theory, but in relation to a *non-signatory* seeking to force a *signatory* to arbitration. Multiple Eighth Circuit cases have analyzed the same issue—whether a non-signatory may compel a signatory to arbitration—but in most of these cases, courts have faced a set of circumstances wherein a non-signatory has established a close business relationship to a signatory, such that the non-signatory is, in effect, asking to be considered a third-party beneficiary to the contract at issue. *See, e.g., In re Wholesale Grocery Prods. Antitrust Litig.*, 707 F.3d 917, 922-23 (8th Cir. 2013) (analyzing agency and estoppel theories advanced by a non-signatory in an attempt to force a signatory to arbitration); *PRM Energy Sys., Inc. v. Primenergy, L.L.C.*, 592 F.3d 830 (8th Cir. 2010) (same); *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 799 (8th Cir. 2005) (same).

Unsurprisingly, Defendants heavily rely on the Eighth Circuit's decision in *Reid* in

their briefing and urge the Court to imagine, first, that Arkansas courts would endorse a direct benefits estoppel theory to force an unwilling non-signatory to arbitration; and, second, that the facts in the case at bar would fit the direct benefits estoppel theory described generally in *Reid*. Bearing in mind that the *Reid* court only engaged in the direct benefits estoppel analysis after determining that Missouri law applied and that Missouri courts were potentially open to the notion of binding an unwilling non-signatory to arbitration at a signatory's request, the Court now analyzes whether such a theory applies to bind Mounce to arbitration.

### III. DISCUSSION

Since *Reid* is the only in-circuit authority that exists on the arbitration issue here, the Court will begin with that case. The *Reid* court determined that, under Missouri law, a signatory could potentially bind a non-signatory to arbitration if the non-signatory (1) knowingly sought and obtained direct benefits from the contract, *or* (2) sought to enforce the terms of the contract or asserted claims that must be determined by reference to the contract. 701 F.3d at 840 (emphasis added) (citing *Nitro Distrib., Inc. v. Dunn*, 194 S.W.3d 339, 348 (Mo. 2006)). Defendants in the instant case concede the first prong of the test does not apply, as Mounce did not knowingly seek and obtain direct benefits from the provider agreement prior to filing this lawsuit. Defendants focus instead on the second prong of the *Reid* test, which they use to argue that "Mounce's complaint leaves no doubt that she seeks to enforce the provider agreement to receive the benefit of it" or is "asserting claims that can only be determined by reference to the provider agreement." (Doc. 28, pp. 10–11).

Defendants' argument is seductive in its simplicity: If Mounce referenced the provider agreement in describing the claims in her Complaint, then she must have asserted claims that can only be determined by reference to the agreement, and she must therefore be estopped from refusing to submit to the arbitration provision in that agreement. Defendants state that they counted "approximately 30 separate paragraphs" in the Complaint in which Mounce made reference to the existence of the provider agreement (Defendants' Reply Brief, Doc. 31, p. 7)—a number they imply is quite considerable. In the Court's view, however, eviscerating a non-signatory's Seventh Amendment right to trial by jury should not be so handily accomplished. As the Second Circuit observed in *Thomson-CSF, S.A. v. American Arbitration Association*, "[a]rbitration is strictly a matter of contract; if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so." 64 F.3d 773, 779 (2d Cir. 1995).

*Reid* does not shed much light on the second prong of the direct benefits estoppel test, in large part because the *Reid* court did not ultimately find that direct benefits estoppel justified binding the plaintiffs in any manner. 701 F.3d at 848 (determining there was no "close[] nexus between the nonsignatory and the agreement with the arbitration clause"). Even the Missouri Supreme Court case on which the *Reid* court relied, *Nitro Distributing, Inc. v. Dunn*, 194 S.W.3d at 339, involved plaintiffs that had more significant contacts with the contract and the defendants at issue there than Mounce does here. *Nitro Distributing* involved claims against defendants who were members of the Amway family of companies. *Id.* at 344-45. The defendants attempted to compel the plaintiffs to arbitration, invoking the theory of direct benefits estoppel. *Id.* at 348. The issue, however, was that the plaintiff

companies were owned by an Amway distributor, but were not parties to the contracts signed by that distributor and Amway. The interconnected relationship between the plaintiff companies, their owner, the defendant companies, and Amway was the focus of the *Nitro Distributing* court's analysis of whether to bind the plaintiffs against their will to arbitration. *Id.*

Defendants' theory for binding Mounce to arbitration is grounded in the notion that Mounce has sought to avail herself of the benefits of the provider agreement—by filing this lawsuit and pointing out the existence of the agreement and its relevant terms, and by complaining that Defendants did not follow the agreement—but now refuses to accept the detriment of the agreement: the arbitration provision. Defendants essentially contend that Mounce seeks to have her cake and eat it, too. But the obvious flaw in Defendants' reasoning is that the language of the agreement itself forecloses Mounce from obtaining benefits or rights under it. *See* Provider Agreement, Doc. 27-4, p. 17 ("there is no intent by either party to create or establish third party beneficiary status or rights as to any patient"). Defendants would rather the Court not consider this relevant fact in the arbitration analysis. *See* Defendants' Reply Brief, Doc. 31, p. 7 n.2 ("Defendants agree with Mounce that she has no right to enforce the provider agreement, but that is a question going to the merits of her claims and is not an appropriate part of the Court's arbitrability analysis.")

If Mounce cannot "have her cake" by the plain language of the agreement, why should she be stripped of her right to access the court system to present her non-contract tort claims, for example? An analysis of her Complaint reveals that, but for the claim for

injunctive relief, all claims are made independently of the provider agreement and would still exist even if the agreement were declared void. Count One, brought pursuant to the ADTPA, alleges that Defendants committed an unconscionable, false, or deceptive act or practice in business, commerce, or trade when they represented to Mounce that they would submit her hospital bills to Blue Cross, but instead asserted a medical lien on her third-party recovery with a third-party tortfeasor. This claim could be proven without requiring specific performance of the agreement. Count Two is a claim for tortious interference with contract, which would require Mounce to prove: (1) the existence of a health insurance contract between herself and Blue Cross, (2) Defendants' knowledge of that contractual relationship, (3) Defendants' intentional interference with the relationship, such as to induce or cause a breach or termination of the contract, and (4) damages as a result of Defendants' interference. *See Baptist Health v. Murphy*, 2010 Ark. 358, *16 (2010) (listing elements of cause of action for tortious interference with contract). Again, all of these elements could be established by mere reference to the existence of the agreement. Finally, Count Three, a claim for unjust enrichment, would require Mounce to make calculations that assumed certain dollar amounts that *would have been* paid by Blue Cross *if* Mounce's hospital had submitted her bills to Blue Cross first, and *if* Blue Cross had paid her bills at the reduced rates negotiated and set forth in the provider agreement. Count Three does not require Mounce to request specific performance.[1]

---

[1] Mounce's fourth and final claim for injunctive relief requests that the Court enjoin Defendants from engaging in their current billing practices. She also implies in Count Four that the Court should require Defendants to comport with the billing practices and rates set forth in the provider agreement. However, Mounce will only prevail on Count Four if she first prevails on one of her other three substantive claims and proves Defendants' current billing practices are unlawful. "[T]o obtain a permanent injunction[,] the movant must attain

In denying Defendants' Motion to Compel Arbitration, the Court also finds helpful a case from the Third Circuit, which more thoroughly considered the question of applying direct benefits estoppel to bind an unwilling non-signatory. In *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 (3d Cir. 2001), the Court noted that, though it "ha[d] never applied an equitable estoppel theory to bind a non-signatory to an arbitration clause," there appeared to be "no reason why, in an appropriate case, [it] would refrain from doing so." However, the Court went on to reason why estoppel could only equitably apply in such a situation if one of two conditions were true. The first condition would "involve non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract," *id.*; and the second condition would focus on "the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract and the fact that the claims were intertwined with the underlying contractual obligations," *id.* at. 201.

Both the first and second conditions above are not present in the case at bar. As the Court noted previously in this opinion, Mounce's lawsuit is premised on her complaint that she did not benefit from the contract prior to filing suit. Further, the provider agreement specifically disclaims an intent to benefit Mounce or any patient like her.

---

success on the merits." *Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999). Therefore, even if Mounce's fourth claim seeks specific performance of the provider agreement, and even if the Court were to find that Arkansas courts would entertain the possibility of referring such a claim to arbitration under a direct benefits estoppel theory, the Court would still refuse to refer that claim at this time, as the resolution of Count Four is dependent on the outcome of Mounce's other claims.

Therefore, Mounce has no "obligations and duties" under the provider agreement.

The fact that Mounce's case does not fit into either condition described in *DuPont* above provides firmer support for the Court's conclusion that direct benefits estoppel does not properly apply here. Moreover, the Court is unconvinced that Arkansas' highest court would apply direct benefits estoppel to bind a non-signatory, like Mounce, to binding arbitration, given the facts set forth by the parties. Ordering a non-signatory to a contract to abide by the contract's terms is not an act to be taken lightly, particularly when doing so would result in the non-signatory's loss of a constitutional right. "It is elementary that the Seventh Amendment right to a jury is fundamental and that its protection can only be relinquished knowingly and intentionally." *Nat'l Equipment Rental, Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir.1977). The strong presumption in favor of arbitration is grounded in respect for the parties' right to contract as they see fit—including to contract away the right to trial by jury. But there is no such underpinning here. And since no justification otherwise exists for depriving Mounce of her fundamental right to a jury trial, the matter will not be sent to arbitration.

## IV. CONCLUSION

For all of these reasons, Defendants' Motion to Compel Arbitration (Doc. 27) is **DENIED**.

**IT IS SO ORDERED** on this 22nd day of December, 2015.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE