**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

JESSICA MOUNCE, Individually
and on Behalf of All Others Similarly Situated                                    PLAINTIFF

V.                                   CASE NO. 5:15-CV-05197

CHSPSC, LLC; NORTHWEST ARKANSAS
HOSPITALS, LLC d/b/a NORTHWEST MEDICAL CENTER;
and PROFESSIONAL ACCOUNT SERVICES, INC.                         DEFENDANTS

<u>**MEMORANDUM OPINION AND ORDER**</u>

Currently before the Court are Defendants CHSPSC, LLC ("CHSPSC"), Northwest

Arkansas Hospitals, LLC ("the Hospital"), and Professional Account Services, Inc.'s

("PASI") Motion for Summary Judgment (Doc. 44), and Plaintiff Jessica Mounce's Motion

for Class Certification (Doc. 42).[1] The Court held a hearing on both Motions on November

3, 2016, at which time the parties presented oral argument to the Court.

Defendants argue in their Motion for Summary Judgment that Ms. Mounce's

individual claims must be dismissed because she voluntarily paid the hospital bill at issue

in the case, and in doing so, gave up the right to file any lawsuit concerning the lien.

Defendants also argue that Ms. Mounce's substantive claims for violations of the Arkansas

---

[1] Both Motions have been fully briefed. With respect to the Motion for Summary Judgment (Doc. 44), the Court reviewed Defendants' Brief in Support (Doc. 45) and Statement of Facts (Doc. 46), Plaintiff's Response in Opposition (Doc. 49) and Statements of Facts (Docs. 48, 50), and Defendants' Reply (Doc. 53) and Response to Statement of Facts (Doc. 54). As for the Motion for Class Certification (Doc. 42), the Court reviewed Plaintiff's Brief in Support (Doc. 43), Defendants' Response in Opposition (Doc. 51), and Plaintiff's Reply (Doc. 55). In addition, the Court reviewed Defendants' Notice of Supplemental Authority (Doc. 59), which was filed after briefing on the Motion for Summary Judgment was complete, and Plaintiff's Response to the Notice (Doc. 60).

1

Deceptive Trade Practices Act ("ADTPA"), Ark. Code Ann. § 4-88-101 *et seq.*, common-law tortious interference with business expectancy/contract, and unjust enrichment should be dismissed on the merits. Defendants point out that if summary judgment is granted and the Court dismisses Ms. Mounce from the lawsuit, her Motion for Class Certification will become moot, as she is the only named plaintiff in the case and the only person identified as having an interest in serving as class representative.

In response to the Motion for Summary Judgment, Ms. Mounce concedes that she directed her attorney to negotiate with PASI, the billing agent of the Hospital, for a reduction in the hospital bill associated with the lien that had been filed against her unliquidated tort claim; however, she argues that her payment to PASI was not voluntary and therefore should not preclude her from bringing this lawsuit. She further contends that her substantive claims have merit and that she is a proper representative of a class of more than 850 individuals who are similarly situated. In her Motion for Class Certification brought pursuant to Federal Rule of Civil Procedure 23, she explains why she believes the Court should certify a class of former patients of the Hospital, such as herself, who had what she characterizes as improper or illegal liens asserted against their third-party tort claims. Defendants respond that a class action would not be an efficient and effective mechanism for resolving these patients' claims—if indeed the claims have merit—and that, in any event, Ms. Mounce would not be an appropriate class representative.

Below, the Court will set forth the background facts at issue in the case, and then it will take up Defendants' Motion for Summary Judgment, followed by Ms. Mounce's Motion for Class Certification. For the reasons explained herein, the Motion for Summary

Judgment (Doc. 44) is **DENIED**, and the Motion for Class Certification (Doc. 42) is **GRANTED**.

## I. BACKGROUND

Jessica Mounce, individually and on behalf of an Arkansas class of persons similarly situated, filed a lawsuit (Doc. 3) in Washington County Circuit Court on June 3, 2015, alleging violations of the ADTPA and claims for tortious interference, unjust enrichment, and injunctive relief against the Hospital where she sought treatment for injuries, and against two other companies affiliated with the Hospital.[2] The case was removed to this Court by Defendants on August 18, 2015, and an Amended Complaint (Doc. 39) was filed on February 10, 2016. The Amended Complaint omits a separate cause of action for injunctive relief, but is otherwise substantially similar to the original Complaint.

### A. Treatment at the Hospital

The circumstances leading up to the filing of this case began when Ms. Mounce was injured in an automobile accident on November 27, 2013. She was not at fault. The driver who caused the accident was insured by Horace Mann Insurance ("Horace Mann"), and Ms. Mounce engaged an attorney named Jeff Slaton to assist her in pursuing a tort claim against the driver. Ms. Mounce did not seek medical attention immediately after the accident. Instead, she waited until November 30, 2013, to visit the emergency room at Northwest Medical Center in Springdale, Arkansas. During intake, she handed her health insurance card to a Hospital employee.

---

[2] Aside from the Hospital, the other Defendants named in the lawsuit are CHSPSC, formerly known as Community Health Systems Professional Services Corporation, which provides administrative and consulting services to the insurance plans that contract with the Hospital; and PASI, which is the billing entity for the Hospital.

Ms. Mounce's health insurance at the time was provided through the George's Inc. Medical Plan ("the George's Plan" or "the Plan"), an ERISA-based employer benefit plan that assumes responsibility for paying the health care services incurred by its members. *See* Doc. 51-3, Dep. of Benjamin Butler, p. 6. The George's Plan contracted with Arkansas Blue Cross and Blue Shield ("Blue Cross") as the Plan's Claims Administrator. According to the Plan, employees and their dependents participate in a Preferred Provider Organization ("PPO"), in which participating medical service providers agree to accept PPO allowances and charge persons who are covered under the Plan certain reduced rates for services. (Doc. 51-1, p. 46).

Ms. Mounce, as a person covered under the Plan, was also considered a "member" of Blue Cross's True Blue PPO Network Agreement ("the Provider Agreement") (Doc. 50-23, pp. 2-3) (defining a "member" as "any person who satisfies the eligibility requirements and financial obligations to qualify for coverage of health care services under a Health Plan, including but not limited to . . . any . . . health benefit plan, whose sponsor or claims administrator has entered into any PPO Network access agreement with [Blue Cross] . . . ."; and specifying that hospitals who enter into Blue Cross's Provider Agreement "agree to provide Covered Services to Members"). Blue Cross, as Claims Administrator of the George's Plan, negotiated the Provider Agreement with the Hospital. *Id.* at 2. The Provider Agreement sets forth a discounted payment schedule for medical services rendered to Blue Cross's members. *See id.* at 21 (showing rates applicable to the Hospital). Further, Blue Cross's corporate representative confirmed in a deposition that Blue Cross considered Ms. Mounce to be a member, and would have processed and paid the Hospital's bill for her medical treatment from November of 2013, had the bill been

4

submitted by the deadline established in the Provider Agreement. *See* Doc. 55-8, Dep. of Benjamin Butler, pp. 2-3.

Ms. Mounce testified that after she gave her health insurance card to the Hospital employee who was performing intake, the employee asked whether her injuries had resulted from a car accident, and Ms. Mounce confirmed that they had. *See* Doc. 44-1, Dep. of Jessica Mounce, p. 14. The employee then asked Ms. Mounce who was at fault in the accident and whether the other driver had insurance, and the employee recorded the information Ms. Mounce provided. *Id.* At some point, Ms. Mounce was presented with a form called "Conditions of Admission and Consent to Medical Treatment" ("Admission Form") (Doc. 42-14), which all patients must read and sign. The first paragraph of the Admission Form states the following:

> I hereby assign and authorize payment directly to the Facility, and to any facility-based physician, all insurance benefits, sick benefits, injury benefits due because of liability of a third party, or proceeds of all claims resulting from the liability of a third party, payable by any party, organization, et cetera, to or for the patient unless the account for this Facility, outpatient visit or series of outpatient visits is paid in full upon discharge or upon completion of the outpatient series. If eligible for Medicare, I request Medicare services and benefits. I further agree that this assignment will not be withdrawn or voided at any time until the account is paid in full. I understand that I am responsible for any charges not covered by my insurance company.

*Id.* at 3.

According to Ms. Mounce, she was told by someone at the Hospital that her bill would be submitted to her health insurer, Blue Cross, for direct payment. *See* Doc. 44-1, p. 21. She believed this would be the case. *Id.* at 20, 25. She also signed the Admission Form, as evidenced by her recollection that she "sign[ed] a paper that sa[id] that they're going to submit the claim [to insurance]." *Id.* at 26. To Ms. Mounce, the Admission Form

"clearly indicated" to her that she "would only be responsible for charges not covered by her insurance company." (Doc. 49, pp. 20-21). She came to this conclusion after reading the last sentence of the first paragraph of the Admission Form, which states: "I understand that I am responsible for any charges *not covered by my insurance company*." (Doc. 42-14, p. 3 (emphasis added)).[3]

## B. The Hospital's Billing Policy for Tort Victims

The parties agree that the Hospital never submitted Ms. Mounce's bill to Blue Cross for payment. Instead, the Hospital followed a special billing policy used in auto accident cases, which the Hospital's Assistant Chief Financial Officer, Susan Parker, explained in her deposition. Ms. Parker testified that in non-auto accident cases, it is the policy of the Hospital to obtain the health insurance information of the patient and then have PASI bill the patient's health insurance company. (Doc. 50-24, Dep. of Susan Parker, p. 9). However, in auto accident cases where it is suspected that the patient's injuries were caused by another party, the Hospital's policy is to allow PASI to determine whether to seek payment from a different source than health insurance. *Id.* at 10. *See also* PASI's Standard Patient Accounting User's Manual (Doc. 42-11, p. 6 (explaining patient

---

[3] In addition to the statements in the Admission Form, Ms. Mounce maintains that other sources of information may have contributed to her belief that the Hospital would submit her bill to Blue Cross before seeking payment from another source. In particular, Ms. Mounce notes that the Hospital's website advertised that it "accept[s] all major health plans and managed care programs" and will "bill your insurance company in a timely manner and do everything we can to expedite your claim." (Doc. 50-1). Regardless of whether Ms. Mounce and/or any putative class members actually relied on the Hospital's website, or on signs posted in the lobby or at the intake desk listing billing information, the parties agree that all patients who receive treatment at the Hospital must sign the Admission Form, so all putative class members were given information about the Hospital's billing policy at least through that document.

registration and billing procedures to be followed when a patient advises "there is automobile insurance or liability involved")).

Defendants believe that, under the Hospital's Provider Agreement with Blue Cross, as well as under its provider agreements with other major health insurance companies, PASI is not required to bill a patient's health insurance as "primary" if the patient was the victim of an auto accident and the patient was not at fault. In such a situation, Defendants consider it proper to bypass the usual process of making a claim against the patient's health insurance company and instead assert a medical lien against the patient's unliquidated third-party tort claim, in the full, undiscounted amount of the hospital bill. *See* Doc. 50-24, Dep. of Susan Parker, p. 23 ("[W]e have under Blue Cross Blue Shield [a Provider Agreement] saying Blue Cross Blue Shield is not primary, you can file a medical lien. And so that's what we did.").

The corporate representative for PASI, Michael Lynch, testified that he also understood that the policy of the Hospital was for PASI "to pursue third-party auto insurance [claims] *primary* over the [patients'] health insurances." (Doc. 50-21, Dep. of Michael Lynch, p. 3 (emphasis added)). He further acknowledged that the major health insurers—Blue Cross, Humana, Coventry, Aetna, Cigna, and UHC—are all treated the same by PASI in this respect: regardless of which health insurance company provides coverage, the patient will not receive the benefit of the provider agreement that was negotiated between the insurance company and the Hospital if her medical treatment resulted from injuries sustained in an accident, and she was not at fault. *Id.* at 3-4. In that scenario, PASI's policy is to treat the patient as if she had no primary health insurance

coverage at all, and then assert a lien in the full amount of the medical bill against her unliquidated tort claim. *Id.* at 8.

In Ms. Mounce's case, because she informed the Hospital during intake that she had been involved in a car accident and that she was not at fault, her medical bill was not submitted to Blue Cross for payment. Instead, PASI prepared a Notice of Hospital Lien on or about January 9, 2014, which stated:

> The undersigned hereby gives notice for and on behalf of, Northwest Medical Center Springdale, located at 609 West Maple Ave., Springdale, AR 75765 (hereinafter "Hospital"), that the Hospital has furnished hospital care, treatment and/or maintenance, all of which was medically necessary, to the following patient: JESSICA MOUNCE . . . from 11/30/13 to 11/30/13 due to injuries sustained in and/or by a motor vehicle or other liability accident, on or around 11/30/13 and the amount due for these services is $6104.96, a sum that is a reasonable charge for the hospital care, services, treatment and/or maintenance rendered the above referenced patient.
>
> The person(s), firm(s), corporation(s) or insurance companies claimed by the patient or his/her legal representative to be liable for damages arising from the illness or injuries cared for, treated and/or maintained by the hospital is/are:
>
> **HORACE MANN INSURANCE P.O. BOX 631790 CLAIM #27859Z IRVING TX 75063 CLM #27859Z**
>
> The Hospital, therefore, hereby creates a lien up to the maximum allowable amount of any obtained or recovered damages which the patient or his/her legal representative may receive or be entitled to receive, whether by judgment, settlement or compromise, from any and all causes of action, suits, claims, counterclaims or demands accruing to the patient, all in accord with the provisions of the laws of the State of AR.

(Doc. 44-6).

## C. The Arkansas Hospital Lien Act

Defendants believe the unique billing practice it reserves for its tort-victim patients is legal in light of the provisions of the Arkansas Medical, Nursing, Hospital, and

8

Ambulance Service Lien Act, Ark. Code Ann. § 18-46-101 *et seq.* ("Arkansas Hospital Lien Act" or "the Act"). The Act states that if a hospital renders services to a patient who has been injured through the fault or neglect of another, the hospital shall have a lien "[o]n any claim, right of action, and money to which the patient is entitled because of that injury . . . ." Ark. Code Ann. § 18-46-104. Ms. Mounce argues that Defendants are using the Act as a sword, rather than the shield the legislature intended it to be, by treating patients with insurance as if they were uninsured, and then asserting improper liens against their tort claims. She maintains that the Hospital's policy not only deprives accident victims of the benefits of their health care coverage, but creates a situation where liens are being asserted, but no underlying debts are owed.

### D. Payment of the Bill and Release of the Lien

Ms. Mounce's attorney, Jeff Slaton, engaged in a series of communications with PASI representatives regarding the lien. When Mr. Slaton was deposed in this case, he testified that he believed the Hospital's lien was wrongful at the time it was first asserted, and that the Hospital owed a contractual duty to bill Blue Cross before filing a lien against Ms. Mounce's tort claim. Mr. Slaton testified that before he became aware that PASI had filed a lien, he wrote a letter to PASI, (Doc. 44-5), requesting an itemized bill for Ms. Mounce's treatment. He also demanded in the letter that the Hospital submit the bill to Blue Cross for payment, as he knew from similar experiences he had with other clients that it was sometimes the Hospital's practice *not* to bill the patient's health insurance company. *See id.* Mr. Slaton closed the letter by threatening to bring a class action lawsuit against PASI if these issues were not resolved to his satisfaction. *Id.*

After the lien was officially filed by the Washington County Circuit Clerk on February 24, 2014, Mr. Slaton had several conversations with PASI representatives in which he admits to "yelling and screaming" at them that the lien was wrongful. (Doc. 44-4, Dep. of Jeff Slaton, p. 17). He also left a voicemail for PASI representative Elona Rowe, again stating his position that the lien was wrongful. Ultimately, Ms. Mounce agreed to a $16,000.00 settlement of her third-party tort claim, and she gave Mr. Slaton authority to resolve the outstanding hospital lien so that her settlement check would be released. *Id.* at 14.

On December 8, 2014, a PASI representative faxed Mr. Slaton a letter offering to reduce the lien amount by 50% and settle the Hospital's bill for $3,052.48. *Id.* at 17-18. Mr. Slaton accepted the offer on Ms. Mounce's behalf sometime in the second week of December of 2014, explaining in his deposition that he felt "forced" to do so because the settlement check from Horace Mann would have been "tied up" had the lien not been resolved. *Id.* at 14. He also stated that he felt that paying even half the billed amount was "wrongful, as it was still a substantial amount larger than what [he] believed would have been owed by a Blue Cross member after adjustments and any co-insurance amounts that would have been owed." *Id.* at 15. In other words, Mr. Slaton—never having seen the Provider Agreement or been apprised of its terms—believed that Ms. Mounce owed *some amount* of money to the Hospital at the time the lien was settled, but not as much as PASI had demanded. Mr. Slaton sent a cover letter and checks totaling $3,052.48 to PASI on January 20, 2015. (Doc. 44-7). The Hospital filed a Release of Hospital Lien with the Circuit Court Clerk of Washington County, Arkansas, on January 28, 2015. (Doc. 44-8).

This lawsuit was filed on June 3, 2015, in state court, and removed to this Court on August 18, 2015.

## II. LEGAL STANDARD

### A. Motion for Summary Judgment

The standard of review for summary judgment is well established. Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999). Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)).

In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary

judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## B.  Motion for Class Certification

Pursuant to Rule 23, certifying a class action requires a two-step analysis.  First, a class action may be maintained if:  (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(1)-(4).  Second, a class action will be deemed appropriate if a court finds that questions of law or fact common to class members predominate over questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).

An implicit requirement for any class certification inquiry involves a court's assessment as to the ascertainability of the class.  The description of a proposed class must be sufficiently definite to permit class members to be identified by objective criteria. *See Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996–97 (8th Cir. 2016).  "The requirement that a class be clearly defined is designed primarily to help the trial court manage the class.  It is not designed to be a particularly stringent test, but plaintiffs must at least be able to establish that the general outlines of the membership of

the class are determinable at the outset of the litigation." *Bynum v. Dist. of Columbia*, 214 F.R.D. 27, 31 (D.D.C. 2003).

The district court retains "broad discretion in determining whether to certify a class, recognizing the essentially factual basis of the certification inquiry and . . . the district court's inherent power to manage and control pending litigation." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011) (internal quotations and citations omitted).

## III. DISCUSSION

### A. Recent Amendments to the ADTPA

Before discussing the merits of the pending Motions, the Court must pause to address a matter that became relevant only after the parties submitted their briefing and oral argument. Effective August 1, 2017, the Arkansas legislature amended the ADTPA. The law now prohibits an individual from bringing a class-action claim under that statute "unless the claim is being asserted for a violation of the Arkansas Constitution." Ark. Code Ann. § 4-88-113(f)(1)(B). Another amendment to the law changes one of the elements required to prove an individual claim. Before, an individual claimant was only required to show proof of "actual damage or injury as a result of an offense or violation as defined in this chapter . . . " Ark. Code Ann. § 4-88-113(f) (effective July 30, 1999). But post-amendment, a claimant must show that "he or she suffered an actual financial loss proximately caused by his or her reliance on the use of a practice declared unlawful under this chapter." Ark. Code Ann. § 4-88-113(f)(2) (effective Aug. 1, 2017).

In analyzing whether each of these amendments should be given retroactive effect with respect to the claims in the instant case, the Court has reviewed the Arkansas Supreme Court's opinion in *Bean v. Office of Child Support Enforcement*, 340 Ark. 286, 296 (2000). The *Bean* Court explained that in Arkansas, an amendment to an existing law is generally presumed to apply *prospectively*, rather than retrospectively, unless otherwise stated in the text of the amendment itself. However, an exception to this rule arises when an amendment is considered procedural or remedial in nature, rather than substantive. A procedural or remedial amendment will be given retroactive effect, even if the legislature did not specify that intent in the text of the amendment. *Id.* at 297.

With respect to the recent amendments to the ADTPA, the legislature has not explicitly stated that they are to be given retroactive effect. Thus, the Court must consider whether the changes are either procedural or remedial in nature. In general, when an amendment to a law provides a new or more appropriate remedy to enforce an already existing right or obligation, the change is considered procedural; but when an amendment "disturb[s] vested rights, or create[s] new legal obligations," the change is considered substantive. *Id.* To determine whether an amendment is remedial, a court must consider "the spirit which promoted its enactment, the mischief sought to be abolished, and the remedy proposed." *Id.*

Here, the Court finds that one of the amendments—the one that now requires proof of both actual financial loss and proximate causation—is substantive, in that it could deprive a claimant of the ability to assert a cause of action that she could have asserted under the former version of the Act. Because the amendment is substantive, it should only

14

be given prospective effect. As for the other amendment—the one that eliminates a claimant's ability to bring a class action under the ADTPA—it does not appear to be remedial in nature, since the Court cannot imagine what "mischief [the legislature] sought to be abolished" by foreclosing a group of individuals from efficiently banding together to litigate their low-dollar, yet factually similar, claims against a company that violates the ADTPA.

Instead it seems more reasonable that the class-action amendment to the ADTPA is procedural in nature. Even so, that amendment should not be given retrospective application due to the Supreme Court's holding in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393, 409 (2010). In *Shady Grove*, the Court determined that Rule 23, which is, of course, a federal rule of procedure, trumps any state law that is also procedural in nature and that conflicts with it. As Justice Scalia, writing for the Court, explained, a plaintiff litigating in federal court "may bring his claim in a class action if he wishes," as "Rule 23 *automatically* applies 'in all civil actions and proceedings in the United States district courts.'" *Id.* at 400 (quoting Fed. R. Civ. P. 1) (emphasis in original).[4]

---

[4] Justice Scalia's plurality opinion held that Rule 23 always preempts the conflicting state law, regardless of whether the state law is procedural or substantive in nature; but Justice Stevens's concurring opinion held that Rule 23 only preempts a conflicting state law that is procedural in nature. As this Court finds that the class-action amendment to the ADTPA is procedural, rather than substantive, both Justice Scalia's and Justice Stevens's tests are satisfied.

## B. Motion for Summary Judgment

## 1. Voluntary Payment Rule

Under Arkansas law, "[w]hen one pays money on demand that is not legally enforceable, the payment is deemed voluntary." *Douglas v. Adams Trucking Co., Inc.*, 345 Ark. 203, 212 (2001) (quotation and citation omitted). Defendants argue that Ms. Mounce's individual claims must be dismissed due to the operation of this voluntary payment rule, since she and her attorney believed PASI's lien to be illegal, but nonetheless negotiated a 50% reduction of the bill, and then paid it. While the circumstances surrounding this negotiation and payment are in dispute, there is no dispute that the amount of the bill was compromised and paid, and the lien was released.[5]

Defendants contend that Ms. Mounce's payment was voluntary, as she made it with the full knowledge of the lien's alleged illegality. Ms. Mounce responds that her payment was not voluntary because she made it under economic duress and while laboring under a material mistake of fact and/or a fraudulent representation by Defendants that the lien was valid and that she owed a debt for her medical care. Thus, the question before the Court on summary judgment is two-fold: (1) does the voluntary payment rule apply to Plaintiff's causes of action, and if so, (2) is there a fact question as to whether any of the recognized exceptions to the rule would apply, rendering summary judgment improper?

---

[5] Ms. Mounce argues that she, personally, did not make the compromise payment to the Hospital. Instead the payment was made in the form of two checks drawn on the settling insurance companies, with both checks made payable to the Hospital and mailed to Mr. Slaton, who then forwarded them to the Hospital in satisfaction of the lien. Her argument here is a distinction without a difference, as the specific endorsements on the checks were made purely for the parties' convenience, *i.e.,* to avoid the need to circulate one check for multiple endorsements. What matters is that Ms. Mounce directed and authorized these payments, and the checks came from her settlement fund.

### a. Application to the ADTPA Claim

Because the voluntary payment rule is a creature of state common law, there is a persuasive argument that it should not operate as a defense to Ms. Mounce's statutory claim under the ADTPA. This is because consumer protection statutes are intended to be construed broadly in favor of the consumer, such that applying a common-law defense to a consumer's statutory claim may stymie the legislative intent. *See Sobel v. Hertz Corp.*, 698 F. Supp. 2d 1218, 1223-24 (D. Nev. 2010) (collecting cases discussing whether the voluntary payment rule may be properly asserted as a defense to a statutory consumer protection claim). Indeed, several courts have found that public policy does not favor allowing a voluntary payment defense to a statutory claim. *See Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 231 (4th Cir. 2007) (explaining that "common law immunities cannot trump the [Fair Debt Collection Practices] Act's clear application"); *Sobel*, 698 F. Supp. 2d at 1224 (finding that Nevada's Deceptive Trade Practices Act was designed "primarily for the protection of consumers" and that permitting the voluntary payment rule to be asserted as an affirmative defense would be contrary to public policy); *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162 Wash. 2d 59, 86 (2007) (finding the voluntary payment rule "inappropriate as an affirmative defense in the [Washington Consumer Protection Act] context" because the Act should be construed "liberally in favor of plaintiffs"); *Huch v. Charter Commc'ns, Inc.*, 290 S.W.3d 721, 727 (Mo. 2009) ("To allow [defendant] to avoid liability [under Missouri's Merchandising Practices Act] for this unfair practice through the voluntary payment doctrine would nullify the protections of the act and be contrary to the intent of the legislature."); *Ramirez v. Smart*

*Corp.*, 371 Ill. App. 3d 797, 804 (Ill. Ct. App. 2007) (holding that Illinois "has an interest in transactions that violate 'statutorily-defined public policy'" such that "the voluntary payment rule will not be applicable").

According to the Arkansas Supreme Court, the ADTPA was enacted by the legislature "'to protect the interests of both the consumer public and the legitimate business community.'" *State v. R&A Inv. Co.*, 336 Ark. 289, 295 (1999) (quoting from the Preamble to the ADTPA). Thus, the Court believes that the legislature's policy interest in protecting the public against unfair and deceptive trade practices would tend to weigh against allowing a business to use the voluntary payment rule to absolve itself of statutory liability. The Court is mindful of the fact that the Arkansas Supreme Court has yet to rule on this issue one way or another, but believes it would find that a common-law defense such as the voluntary payment rule is inapplicable in the statutory consumer-protection setting.

If, however, the defense could be validly asserted with respect to the ADTPA claim, the Court observes that there are certain recognized exceptions to the voluntary payment rule, including duress, mistake of fact, fraud, coercion, or extortion. *See Douglas*, 345 Ark. at 212. It goes without saying that the ADTPA was intended to create a statutory remedy for consumer fraud. Inasmuch as fraud is an exception to the voluntary payment rule, and construing the record in the light most favorable to Ms. Mounce, there is a material dispute of fact as to whether Defendants made a number of fraudulent representations to her concerning the lien, and she then relied on those representations when negotiating a settlement to release the lien. The representations include, but are not limited to, the following: (1) that her health insurance company would be billed for her treatment; (2) that she owed the Hospital a debt for the full, unreduced amount of her bill; (3) that PASI's lien

18

for the full amount of her bill was valid; and (4) that she owed the Hospital any amount after the 180-day deadline had passed to file a claim with Blue Cross.[6]  For these reasons, summary judgment on the voluntary payment defense is **DENIED** as to the ADTPA claim.

### b.  Application to the Common Law Claims

Ms. Mounce asserts two common law tort claims in her Amended Complaint: tortious interference and unjust enrichment.   The Court must now consider whether summary judgment is appropriate on these claims due to the voluntary payment rule.  Ms. Mounce argues that two exceptions to the rule exist in her case and preclude summary judgment, namely, economic duress and mistake of fact and/or fraud.

### 1.  Duress

The first exception Ms. Mounce argues is duress. She contends that the $16,000 tort settlement that her attorney negotiated with the tortfeasor's insurance company and her auto insurer would have been tied up until the Hospital's lien was resolved.  According to Ms. Mounce, she felt forced to negotiate with PASI to pay off a portion of the bill to release the lien, because she could not withstand the prospect of her settlement check being withheld for some unspecified length of time while she contested the validity of the lien in court.  In addition, she argues that she was subject to economic duress because she feared that if she did not settle the lien, the Hospital would have ruined her credit rating by reporting her debt to credit agencies.

The Arkansas Supreme Court has expressly recognized that economic duress, if present, may be sufficient to void a contract.  *See Cox v. McLaughlin*, 315 Ark. 338 (1993).

---

[6]  The analysis as to both mistake of fact and fraud are set forth in greater detail below. *See* Section III.B.1.b.2, *infra*.

The *Cox* Court explained that to constitute economic duress, a party "must show more than a reluctance to accept the contract and the possibility of financial embarrassment." *Id.* at 345. Instead, the duress must have "resulted from the other party's wrongful and oppressive conduct, and not by his own necessity" such that "the wrongful conduct deprived him of his own free will." *Id.* (citation omitted). The Eighth Circuit has extended the analysis in *Cox* to apply to "duress in general," and to apply to the voluntary payment rule in particular. *Curtis Lumber Co., Inc. v. Louisiana Pac. Corp.*, 618 F.3d 762, 785 (8th Cir. 2010). In considering both the *Cox* and *Curtis Lumber* decisions, this Court rejects the argument that Ms. Mounce was under economic duress to pay the underlying bill (in order to obtain a release of the lien) because of fear that her credit rating could be negatively affected. This argument rests entirely on speculation as to what PASI would or would not do, and is more akin to a threat of financial embarrassment, rather than a threat of true economic deprivation.

Turning to Ms. Mounce's argument that the lien held up the payment of her settlement check and threatened her economic security, the *Curtis Lumber* Court noted that summary judgment is inappropriate on the question of economic duress if material questions of fact remain as to whether the claimant: (1) would have suffered "serious financial hardship" had she not made the required payment, (2) was "the victim of a wrongful act" perpetrated by the payee, and (3) was left with no other option but to pay because "other remedies would have been inadequate." 618 F.3d at 785. The Court is not privy to what Ms. Mounce's financial situation was at the time she accepted PASI's offer of compromise on the bill in order to obtain a release of the lien. Viewing the facts in the

light most favorable to Ms. Mounce, there remain material disputes of fact as to whether she was the victim of a wrongful act by the Hospital, and whether filing suit and forgoing payment of the $16,000 settlement check would have been an inadequate remedy. The Court therefore finds that economic duress remains a valid argument to counter Defendants' voluntary payment defense.

### 2. Mistake/Fraud

Next, Ms. Mounce argues that her payment was not voluntary due to another exception to the rule—the existence of a material mistake of fact and/or fraud. She explains in her briefing that at the time PASI suggested a compromise payment of 50% of the bill in order to release the lien, both she and her attorney believed that she owed *some amount* of money to the Hospital, albeit not the full amount claimed in the lien. In particular, Ms. Mounce and her lawyer believed: (1) that the Hospital wrongly failed to bill Blue Cross for her medical services and had the legal obligation to do so; (2) that if Blue Cross had been billed, Blue Cross would have paid the bill at a reduced rate; and (3) that once Blue Cross paid the bill, Ms. Mounce would have owed the Hospital either a copay, deductible, or coinsurance payment, and nothing more.

Importantly, at the time the bill was negotiated and the lien released, Ms. Mounce and her attorney were not aware of a 180-day claim-filing deadline mandated by the Hospital's Provider Agreement with Blue Cross. Subsequent discovery has revealed that absent a timely filed claim with Blue Cross, the Defendants arguably had no legal basis on which to collect *any amount* from Ms. Mounce. Benjamin Butler, Blue Cross's designated corporate representative, testified that under the Provider Agreement, "Ms. Mounce would

21

not owe *any moneys* under the terms of her health benefit plan *for claims not filed within the timely filing period*." (Doc. 50-12, p. 6 (emphasis added)). The Hospital could not "go against" Ms. Mounce for payment unless it had first filed a timely claim with Blue Cross; and the Hospital would have been barred from "trying to collect moneys for the coinsurance or deductibles" from Ms. Mounce if it had failed to submit a claim to Blue Cross first. *Id.* at 10. In addition, Mr. Butler observed that the calculation of an insured's (or member's) copay, coinsurance, or deductible could *only* be "assessed through processing a claim," which meant that the claims-adjustment process would have been a necessary prerequisite to determining what amounts, if any, were owed for a copay, coinsurance, or deductible. *Id.*

Defendants dispute Blue Cross's interpretation of the Provider Agreement, but do not dispute Ms. Mounce's contention that neither she nor her attorney had access to the Provider Agreement before the bill was paid, and that they were ignorant of the Provider Agreement's terms at the time they negotiated with PASI.[7]

Defendants argue that no mistake of fact or affirmative act of fraud occurred in this case because the Hospital was entitled as a matter of law to assert its lien rights against Ms. Mounce's third-party tort claim. Defendants interpret the Arkansas Hospital Lien Act

---

[7] The Court verified the relevant timeline at issue here with Defendants' attorney, Mr. Marts, during the Motion hearing. Specifically, the Court asked Mr. Marts whether his clients agreed that Ms. Mounce's treatment took place on November 30, 2013, and that 180 days later would have been around May 31, 2014. Mr. Marts agreed that those dates were correct. He also agreed in response to the Court's inquiry, that PASI represented to Mr. Slaton *after the 180-day deadline had expired* that Ms. Mounce owed the full lien amount, but that the Hospital would accept half that amount in settlement.

as giving them an absolute right to assert a lien against a patient's unliquidated third-party tort claim. According to the Arkansas Hospital Lien Act, a hospital shall have a lien:

(1) For the value of the service rendered and to be rendered by the practitioner, nurse, hospital, or ambulance service provider to a patient, at the express or implied request of that patient or of someone acting on his or her behalf, for the relief and cure of an injury suffered through the fault or neglect of someone other than the patient himself or herself;

(2) On any claim, right of action, and money to which the patient is entitled because of that injury, and to costs and attorney's fees incurred in enforcing that lien.

Ark. Code Ann. § 18-46-104(1)-(2).

The Court agrees that Defendants possess certain statutory lien rights. This much is obvious from a plain reading of the statute.[8] The Court further agrees that the statute neither requires nor precludes the filing of a health insurance claim as a first resort. In *Stuttgart Regional Medical Center v. Cox*, 343 Ark. 209 (2000), the Arkansas Supreme Court considered whether agreements executed by a patient's mother and father during their son's hospital treatment affected the hospital's right to later assert a lien against the patient's third-party tort claim. The *Stuttgart* Court found, first, that the Arkansas Hospital Lien Act was "clear and unambiguous." *Id.* at 214. On the facts of that case, the Court ultimately determined that neither of the hospital's admission forms—namely an

---

[8] That said, the Court is skeptical that Defendants' billing policy for insured tort victims is in keeping with the Act's legislative intent. The "purpose of this lien [described in the Act] is to encourage a hospital to extend its services and facilities to indigent persons who suffer personal injury through the negligence of another." *Fort Smith Serv. Fin. Corp. v. Parrish*, 302 Ark. 299, 302 (1990). Insured tort victims are likely not the "indigent" being referred to here, because they have the means to pay for their medical treatment—at such rates and upon such terms that the Hospital had contractually deemed to be a reasonable value for its services.

"Assignment of Insurance Benefits" form and "Payment Policy" form—"placed an obligation on the Hospital to collect against any particular insurer in any particular order." *Id.*[9]

Finally, the Court agrees that "Arkansas Blue Cross and Health Advantage provider contracts do not *require* that claims be filed with them, and recognize that state law specifically grants a lien to providers for Third Party Liability (i.e., providers can claim a part of any third party recovery the member may otherwise seek or be entitled to recover)." (Doc. 50-17, p. 2) (emphasis in original).

But the Court parts company with Defendants' reasoning where they conflate their lien rights under the Act with a presumption that the Act affords them *carte blanche* authority to set the *amount* of a patient's underlying financial obligation. "It goes without saying that there can be no lien when there is no debt, for a lien is purely a security device." *Burnside v. Futch*, 229 Ark. 644, 647 (1958). While the Act permits a hospital to assert a lien to secure payment for "the value of the service rendered," Ark. Code Ann. § 18-46-104(1), it does not authorize a hospital to ignore contractually negotiated rates and terms when determining the amount of the underlying medical debt. Thus, one issue here is whether the Defendants were mistaken—and/or acting with fraudulent intent—when they collected a debt (by enforcement of a lien) in an amount that contravened the contractual

---

[9] Although the patient argued on appeal that the hospital "was required to attempt collection of insurance benefits first from [the patient's] medical insurer, CHAMPUS, and that this was a 'condition precedent' to the enforcement of any lien," the *Stuttgart* Court apparently did not consider whether a provider agreement existed between the patient's health insurer and the hospital. Instead, the only contracts the Court examined were the standard intake forms authorizing the direct assignment of benefits. Examining only those forms, the Court concluded that their terms did not prevent the hospital from declining to file a claim with the patient's health insurer and instead pursuing full payment of the bill through a lien asserted against the underinsured motorist proceeds that the patient eventually received in settlement with his auto insurer. *Id.* at 245.

terms and prices that Defendants had agreed to charge Ms. Mounce, as a defined member of Blue Cross's True Blue PPO Network.

Ms. Mounce contends that the Hospital's Provider Agreement extinguished the Hospital's ability to assert a lien against her or her assets after the 180-day deadline to file claims with Blue Cross had expired. Under Ms. Mounce's theory, she owed nothing to the Hospital after May 31, 2014, by the terms of the Provider Agreement.[10] Since she owed nothing after that date, no underlying debt existed upon which to assert a lien. Continuing the argument, the lien would have been void at the time PASI offered to accept 50 cents on the dollar in payment for the bill, and the lien continued to be void when Ms. Mounce forwarded the Hospital a portion of her tort settlement to release the lien.

Ms. Mounce contends that she did not possess all the material facts when she settled the Hospital's bill. Indeed, the terms of the Provider Agreement itself, which were not known to Ms. Mounce, state that the Hospital is prohibited from collecting "any amount"—including copays, deductibles, and coinsurance—from the member or her asset if a claim or bill for services is not "actually received . . . within 180 days following the date

---

[10]  For the sake of clarity, the Court pauses to explain here that in a prior Order (Doc. 37), the Court determined that Blue Cross's insureds/members are not third-party beneficiaries under the Provider Agreement. The Provider Agreement designates the Hospital as a PPO in exchange for its agreement to provide Blue Cross Plan participants with certain benefits—most importantly, the benefit of reduced rates for services. The Court's Order denied Defendants' Motion to Compel Ms. Mounce to arbitration, finding that she was a non-signatory to the Provider Agreement and could not be bound by its terms, including the arbitration clause. The Provider Agreement expressly denies Plan members the right to specific performance under the contract. But in this case, Ms. Mounce is not seeking specific performance of the Provider Agreement. None of her claims are for breach of contract. Further, the Court previously ruled that in order to prove her ADTPA, tortious interference, and unjust enrichment claims she would not need to go so far as "to request specific performance." *Id.* at 11. Instead, at most she would need to refer "to the existence of the Agreement and its terms." *Id.*

the services were provided to a Member . . . ." (Doc. 50-23, p. 4). Next, a September 2008 multi-page pamphlet entitled "Providers' News," which was extensively referenced by the parties in their briefing, adds even greater clarity. *See* Doc. 50-17.[11] In the Providers' News pamphlet, Blue Cross acknowledges that "Arkansas Blue Cross and Health Advantage provider contracts do not *require* that claims be filed with them, and recognize that state law specifically grants a lien to providers for Third Party Liability (i.e., providers can claim a part of any third party recovery the member may otherwise seek or be entitled to recover)." *Id.* at 2 (emphasis in original). But at the same time, if a hospital chooses not to submit claims for payment, there are consequences:

> [T]he provider *cannot* attempt to recover "Excess Amounts" [above the Arkansas Blue Cross or Health Advantage payment] from the *member*. Any attempt to bill the member or collect against the member or their assets for Covered Services will be deemed a violation of the network participation agreement.

*Id.* (emphasis in original).

In the absence of more specific guidance from Arkansas courts on how to interpret these issues, the Court has examined several opinions from other states that have

---

[11] The parties agree that this pamphlet constitutes a legal amendment to the terms of the Provider Agreement, and the Court has therefore treated it as such. The document states:

> To the extent that any of the preceding rules of network participation have not been clearly understood or interpreted by any provider or party, this *Providers' News* article shall be deemed to constitute notice of an amendment to the network participation agreement of Arkansas Blue Cross and Health Advantage participating providers.

(Doc. 50-17, p. 3).

analyzed their own hospital lien laws.[12]  Although these cases are not binding on the Court,

the opinions summarized here highlight the limitations that provider agreements may place

on hospitals' lien rights.  For example, in *Midwest Neurosurgery, P.C. v. State Farm

Insurance Companies*, 268 Neb. 642 (2004), a hospital provided treatment to a car-

accident victim who had health insurance.  The hospital sent the bill to the health insurance

company, and the bill was paid at a reduced rate previously negotiated through a provider

agreement.  *Id.* at 645.  Only after the hospital was paid by the health insurer did it assert

a lien against the patient's unliquidated third-party tort claim for the difference between the

full amount of the bill and the reduced amount the health insurer paid.  *Id.*  The parties

_____

[12]  The Court observes that Defendants filed a Notice of Supplemental Authority (Doc. 59), and attached a decision recently issued by the Honorable D.P. Marshall, Jr., United States District Judge for the Eastern District of Arkansas.  Although Defendants seem to think Judge Marshall's case is so similar to this one that the outcome should be the same, the Court disagrees.  That case, *Lacey Robinett v. Shelby County Healthcare Corp., et al.*, (Doc. 59-1), involved the question of whether a hospital properly refused to bill Medicaid for a car-accident victim's injuries, and instead asserted a lien against the victim's third-party tort claim.  As Judge Marshall explained, "[n]othing in federal or Arkansas law prohibited [the hospital's] maneuver" of seeking reimbursement for a medical bill from a potentially liable third party *before* seeking payment from Medicaid.  *Id.* at 5.  Therefore, the hospital was within its rights to assert a lien against the patient's third-party tort recovery, and to actually collect the entire, unreduced amount of the bill from the patient's assets, without first billing Medicaid and without incurring any adverse consequences.

By contrast, the contracts that govern the amounts the Hospital may charge the members of health insurance plans are far more restrictive than Medicaid's requirements.  For example, the Provider Agreement for Blue Cross limits the Hospital's ability to collect money from a member, or from the member's asset, if the Hospital fails to submit a claim or bill for services to Blue Cross "within 180 days following the date the services were provided to a Member . . . ."  (Doc. 50-23, p. 4).  And although the Provider Agreement does not require that a claim be filed at all, the failure to file a claim forecloses the Hospital's ability "to collect against the member or their assets for Covered Services."  (Doc. 50-17, p. 2).  Because the claims here do not depend on the Court's interpretation of the Medicaid statutes, but instead depend on other contractual requirements between the Hospital and private health insurance companies, the *Robinett* case that Defendants cite as supplemental authority is irrelevant to the issues here.

agreed that the patient still owed a copayment to the hospital, but the hospital's lien assumed a debt much larger than the copayment.  In analyzing Nebraska's hospital lien statute, the Nebraska Supreme Court noted that the hospital had agreed to accept "as payment in full" the amount computed under the provider agreement by the victim's health insurance company, and, therefore, the hospital could not seek further payment by relying on the state's hospital lien act "to escape the consequence of the agreements that it struck with [the victim's health insurance company] and [the victim]."  *Id.* at 654.  The amount of the lien was the amount of the copayment, and nothing more.  *Id.*

In the California Supreme Court case of *Parnell v. Adventist Health System/West*, 35 Cal. 4th 595, 609 (2005), the Court similarly found that, according to the terms of a provider agreement between an insurance company and a hospital, the patient's debt was effectively extinguished, and the hospital could not come back after the fact and attempt to assert a lien against the patient's third-party tort claim under the state's hospital lien act. In *Parnell*, the hospital billed the patient's health insurance company, and the insurance company paid the bill pursuant to reduced rates negotiated in a provider agreement.  *Id.* The Court ruled that the hospital was prohibited from filing a lien against the patient's third-party tort claim for the difference between the full amount of the hospital bill and the reduced amount paid by insurance because, under the terms of the provider agreement, the patient no longer owed a debt to the hospital, and "the hospital may not assert a lien under the [Hospital Lien Act] against [the patient's] recovery from the third party tortfeasor." *Id.*

The Georgia Court of Appeals also observed that, under its state hospital lien act, "a hospital has the right to file a lien for reasonable charges against any cause of action accruing to an injured person to whom the hospital provided care." *MCG Health, Inc. v. Owners Ins. Co.*, 302 Ga. App. 812, 813 (2010). However, because the hospital failed in that case to bill the patient's health insurance company at any time before filing a hospital lien against the patient's third-party tort claim, the underlying debt owed by the patient was extinguished due to explicit provisions in the provider agreement. *Id.* at 814-16. The *MCG* Court opined that the state's legislature obviously did not intend "that a lien could be filed on a person's property when that person owes no obligation to the lien claimant." *Id.* at 818. The Court also analyzed the provider agreement and found that two of its provisions unambiguously "negate[d] the existence of [the patient's] obligation to pay [the hospital]." *Id.* at 819. Although the contract may have initially allowed a lien to be filed against the patient under the state's hospital lien act "*prior to* submitting a claim to [the health insurer]," *id.* at 816 (emphasis added), at some point, the hospital's failure to file a claim with the patient's insurance company negated the existence of any debt owed by the patient that could support a continuing lien.

Finally, in *Lopez v. Morley*, the Illinois Court of Appeals analyzed the state's Health Care Services Lien Act and found that a hospital could not rely on the Act to absolve the hospital of its responsibilities under a provider agreement. 352 Ill. App. 3d 1174 (2004). In *Lopez*, the hospital billed the patient's health insurance, and the insurer paid the bill at the reduced rate negotiated in the provider agreement. *Id.* at 1175. "Under the terms of their contract, the amount paid by [the insurer] would be considered full payment for the

services rendered to the insured, and [the hospital] would not seek recovery for any additional amounts from the insured." *Id.* However, this did not end the matter, because the patient later filed suit against the tortfeasor who was responsible for his injuries and received a settlement, and *only then* did the hospital assert a lien against the value of the settlement "for the difference between what was charged and what was paid by [the health insurer]." *Id.* The Court of Appeals rejected the hospital's reliance on the state's lien act and focused on the clear recitations set forth in the provider agreement, noting:

> We see no reason why such contracts [between hospital and health insurer] should be ignored simply because, but for such contracts, valid liens would exist. The public policy to lessen financial burdens on hospitals does not encompass relieving hospitals of contractual obligations which they later regret undertaking . . . . A hospital's ability to preserve its lien rights lies within its own hands. If a hospital contracts in such a manner that a debt survives, then the lien will survive also.

*Id.* at 1181.

Viewing the facts in the light most favorable to Ms. Mounce, the Court finds that genuine fact issues remain as to whether Ms. Mounce owed any medical debt to Defendants after the 180-day deadline to file insurance claims had passed. And if there was no underlying debt, then the lien wielded by Defendants during settlement negotiations was impotent and unenforceable. Consequently, summary judgment cannot issue on the voluntary payment defense because there remain material, disputed questions of fact as to whether the debt was collected and paid pursuant to a mistake of fact and/or fraud. The Motion for Summary Judgment concerning the voluntary payment defense is therefore **DENIED** as to the common-law claims.

## 2. Merits of the Substantive Claims

In the alternative to the voluntary payment defense, Defendants contend all three of Ms. Mounce's causes of action should be dismissed on the merits. Their arguments as to each are addressed below.

### a. ADTPA Claim

The ADTPA provides that a citizen may maintain a private right of action under Ark. Code Ann. § 4-88-113(f) for "actual damage or injury as a result of an offense or violation as defined in this chapter . . . ."[13] Defendants maintain that Ms. Mounce cannot prove either of the elements required for an ADTPA claim because she cannot establish the existence of a deceptive consumer-oriented act or practice that was misleading in a material respect, or an injury that resulted from such an act or practice. In support of their argument, Defendants point to the Admission Form (Doc. 44-11) that Ms. Mounce signed upon arriving at the Hospital. The Admission Form disclosed to her that the Hospital might seek payment from some source of funds other than health insurance. To Defendants, the fact that Ms. Mounce reviewed and signed the Admission Form is proof that she could not have been deceived as to the Hospital's tort-victim billing policy.

First, there are material disputes of fact as to whether the Hospital's Admission Form was deceptive or misleading. Ms. Mounce argues that the Admission Form that she and every patient of the Hospital signed contained certain statements that implied the Hospital would bill health insurance first, and only after that, seek payment from other

---

[13] The language quoted here is from the version of the ADTPA that was in effect at the time Ms. Mounce filed her claims. As noted in Section III.A., *supra*, the ADTPA was recently amended, but those amendments will not be afforded retroactive effect with respect to Ms. Mounce's claims.

sources for any balances owed. Accordingly, the fact-finder will be called upon to determine the implications of the Admission Form.

Second, there are material disputes of fact regarding whether the Hospital's billing policy for tort victims was deceptive to Ms. Mounce and other patients and violated the ADTPA, particularly where there was proof of health coverage that was presented to the Hospital prior to treatment in each case.

Third, there remains a material question of fact as to whether Defendants acted deceptively in failing to inform Ms. Mounce that they refused to honor the contract they negotiated with her health insurance company to accept certain reduced rates for services and to submit her bill for payment. For all of these reasons, the ADTPA claim will survive summary judgment.

### b. Tortious Interference and Unjust Enrichment

As to Ms. Mounce's common-law claims, she contends that Defendants tortiously interfered with her right to receive the benefits of PPO membership with Blue Cross, and then unjustly enriched themselves—at her expense—by asserting a medical lien against her asset when she owed no underlying debt. Defendants respond that both these claims require evidence of an improper or illegal act, and they believe they did nothing wrong here, i.e., they only asserted their valid lien rights under the Arkansas Hospital Lien Act. In light of the Court's earlier discussion, the Court cannot find as a matter of law that Defendants did nothing improper or illegal here, which means that Ms. Mounce's tortious interference and unjust enrichment claims will remain for trial, and summary judgment on the merits of these claims is **DENIED**.

## C.  Motion for Class Certification

Now that Ms. Mounce's individual claims have survived summary judgment, the Court turns to her Motion for Class Certification.  In it, she proposes the following class definition:

> All Arkansas residents who, since April 30, 2010, received any type of healthcare treatment from any entity located in Arkansas that is owned, controlled, managed and/or affiliated with Defendants, and: (i) such treatment was covered by valid, in network, commercial health coverage; (ii) the billing charges regarding such treatment were not timely submitted to the commercial health carrier; and (iii) Defendants obtained payments for such treatment as a result of asserting third-party medical liens, submitting claims for medical payments coverage, and/or seeking payment directly from the patients.

(Doc. 42, p. 1).  She seeks to serve as the representative of a class of persons similarly situated to herself, whose individual claims are too small to warrant individual lawsuits, but who have suffered substantially the same injuries as a result of Defendants' policies and practices.

Defendants oppose the certification of a class and contend that individualized inquires will be needed at all phases of litigation if a class is certified, such as to render the class action model inappropriate here.  Further, they contend that Ms. Mounce is an improper class representative, as her claims are not similar to those of the class she seeks to represent.  Below, the Court will consider all requirements of Rule 23 for class certification.

### 1.  Numerosity (Rule 23(a)(1)) and Ascertainability

The Court begins by assessing whether the class is so numerous that joinder of all members is impracticable, and, relatedly, whether the members of the class are readily

ascertainable. The Eighth Circuit, "unlike most other courts of appeals, has not outlined a . . . separate, preliminary requirement" of ascertainability that would require plaintiffs to demonstrate a method of identifying class members that is administratively feasible. *See Sandusky Wellness*, 821 F.3d at 996. Rather, the Eighth Circuit simply adheres to a rigorous analysis of the Rule 23 factors, and while it recognizes that this analysis necessarily entails that a class be "adequately defined and clearly ascertainable," the focus of this threshold inquiry is on whether the proposed class definition identifies class members by objective criteria, rather than on the administrative concerns that are already taken into account by the Rule 23(b)(3) factors of predominance and superiority. *See id.*

Defendants do not dispute that the precise number of class members is either known or may be discovered fairly easily. Defendants have identified from their own records upwards of 850 of these putative class members. Moreover, they have produced a spreadsheet, (Doc. 42-13), containing the names, addresses, health carriers, lien filing dates, amounts of money recovered, and sources of funds for every putative class member who was treated at their facilities.

The Hospital admits to having adopted a uniform practice of treating victims of auto accidents differently than other patients for purposes of billing, even when these auto accident victims presented proof of health insurance. Defendants argue that it will be difficult to determine whether someone should be a member of the class because the parties and the Court will have to take up the following individualized inquires: (1) whether the class members' billed medical services would have been covered by valid health plans, or would have been subject to exclusions or refusals to pay; (2) whether class members' claims were "timely submitted" to health plans, according to the different deadlines each

of the carriers imposed in their provider agreements; and (3) whether Defendants received payments on class members' accounts as a result of liens or due to some other method of collection.

First, as the Hospital has admitted that its uniform practice was *not* to file claims with the health insurance companies of the putative class members, the question of whether any bills were "timely submitted" will almost certainly be answered in the negative as to each class member. Next, the question of whether each member's medical treatment would have been covered by insurance—had the Hospital sought to bill the member's insurance carrier—may require some individualized inquiry, but not so much as to render the class action model inefficient or ineffective. The Court is persuaded by the fact that Defendants have already identified both the source and amount of each payment received from each putative class member related to hospital services, and believes that the proposed class definition identifies class members by objective criteria.

### 2. Commonality (Rule 23(a)(2))

Since all putative class members were patients of the Hospital who: (1) suffered injuries as a result of car accidents to which they were not at fault, (2) signed the same Admission Form during intake, (3) presented proof to the Hospital of coverage by one of approximately five major health insurers, and (4) were subject to liens filed against their tort claims for the full amounts of their hospital bills, it is clear to the Court that these class members would share many common questions of law and fact that would be pertinent to the case. Ms. Mounce lists several of these common questions with particularity in her Memorandum of Law in Support of her Motion for Class Certification, as follows:

(a) whether Defendants entered into express and/or implied agreements with various health plan carriers providing, among other things, that health plan claims should be timely submitted to the carriers for payment;

b) whether Defendants violated their contracts with various health plan carriers by not timely submitting medical bills to the carriers;

c) whether Defendants violated their contracts with various health carriers by pursuing recovery for services rendered by placing liens upon patients' property (such as third-party tort claims), pursuing medical payment benefits from auto insurers, pursuing payment directly from the patients, and/or turning patients' accounts over to collections;

d) whether Defendants violated their contracts with various health carriers by not offering a contractually agreed discount to patients covered by said policies;

e) whether Defendants improperly refused to submit the Plaintiff's and the Class Members' medical bills to Plaintiff's and the Class members' health carriers for payment;

f) whether Defendants violated Arkansas Law by illegally coordinating benefits with auto accident coverage;

g) whether Defendants violated the ADTPA by failing to disclose their unfair billing practices to patients and prospective patients;

h) whether Defendants have been unjustly enriched at the Plaintiff's and the Class Members' expense through the above described misconduct;

i) whether Defendants should be enjoined from continuing their improper and unlawful billing practices as described above; and

j) whether the Arkansas lien statute allows Defendants to violate the contracts signed with health insurers and fail to inform patients of the intent to do so.

(Doc. 43, pp. 9-10).

Defendants respond that "Mounce simply lists common issues, never demonstrating how the resolution of any of those issues drives the resolution of the claims that she has

asserted in this case." (Doc. 51, p. 13). The Court disagrees. The common questions identified by Ms. Mounce are easily understood, and their answers will assuredly drive the resolution of the three substantive causes of action in the lawsuit. The requirement of commonality does not mean "that every question of law or fact be common to every member of the class." *Paxton v. Union Nat. Bank*, 688 F.2d 552, 561 (8th Cir. 1982). Furthermore, multiple common questions are not required in order to establish commonality. According to the Supreme Court, "[e]ven a single [common] question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (alterations in original, internal quotation marks and citation omitted).

Here, the putative class members allegedly suffered the same injuries as a result of a uniform billing practice that Defendants admit was employed in car-accident cases. The issue of commonality therefore weighs in favor of certification.

### 3. Typicality (Rule 23(a)(3))

Ordinarily, the claims or defenses of the class representative should be typical of the claims or defenses of the class. Defendants contend that Ms. Mounce's claims are not typical of the class because she is not a member of Blue Cross. The proposed class includes "[a]ll Arkansas residents who, since April 30, 2010, received any type of healthcare treatment from . . . Defendants, and such treatment *was covered* by valid, in network, commercial health coverage . . . ." (emphasis added). Although Ms. Mounce received her health insurance benefits through an ERISA-based employer-benefit plan, her membership entitled her to coverage by Blue Cross as a "member" of Blue Cross's True Blue PPO Network Agreement. *See* Doc. 50-23, pp. 2-3. Further, Blue Cross's corporate

representative confirmed that Ms. Mounce was considered a member of Blue Cross, and the insurer would have processed and paid the Hospital's bill for her medical treatment from November of 2013, had the bill been timely submitted. *See* Doc. 55-8, pp. 2-3.

Defendants also argue that Ms. Mounce's ADTPA claim is not typical of that of the class because the evidence she may rely on to prove this claim is not necessarily the same as the evidence other class members may rely on. The Court is unpersuaded that Ms. Mounce's ADTPA claim is atypical of that of the rest of the class. To prevail on the ADTPA claim, she must establish that Defendants' billing practice was deceptive or misleading in a material respect, and that the practice resulted in an injury to her. Here, the billing practice at issue was uniformly applied to Ms. Mounce and to all class members, and the Hospital made common representations to them regarding its billing practice through the Admission Form. Even if Ms. Mounce relied on additional sources of information to form the basis of her understanding of the billing practice, this fact would not undermine her typicality argument. Her ADTPA claim is typical of the class's because the Hospital sought payment of her bill in the same way that it did the bills of all the other class members.

Finally, Defendants believe Ms. Mounce's claims are not typical because she chose to go to the hospital for certain reasons, and perhaps her reasons were not the same as other class members' reasons. *See* Doc. 51, p. 16. Defendants focus on the fact that "Mounce, for instance, went to the hospital because it was convenient for her boyfriend's football viewing schedule on the day she sought treatment, a specific reason unlikely to be repeated across a class of hundreds of patients." *Id.* Essentially, Defendants argue that the reason why each class member sought treatment matters somehow to the substantive

resolution of the claims.  Again, the Court disagrees and finds instead that the typicality factor weighs in favor of designating Ms. Mounce as Class Representative.

### 4.  Adequacy of Class Representative (Rule 23(a)(4))

The inquiry as to the adequacy of the class representative is similar to the typicality inquiry.  The Court must ask "whether the representative part[y] will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  As a preliminary matter, Defendants argue again that Ms. Mounce is not an adequate class representative because her health coverage was obtained through an ERISA-based benefit plan.  This argument has already been rejected by the Court.  The rest of Defendants' arguments as to adequacy are identical to their arguments as to typicality, and those arguments are either unavailing, or else insufficient to show Ms. Mounce is an inadequate class representative. Rule 23(a)(4)'s requirements are therefore satisfied.

### 5.  Requirements of Rule 23(b)

In addition to finding that Rule 23(a) has been satisfied as to each of the four requirements listed therein, the Court must also consider whether one of three possible requirements of Rule 23(b) has been met prior to certifying a class action.  In particular, the Court must determine if "questions of law or fact common to class members predominate over any questions affecting only individual members"—which is commonly referred to as the "predominance" inquiry—and if "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy"—which is referred to as the "superiority" inquiry.  Fed. R. Civ. P. 23(b)(3).  The following factors are pertinent:

(A)     the class members' interests in individually controlling the prosecution or defense of separate actions;

39

(B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

### a. Predominance

With respect to predominance, the relevant inquiry is whether class issues will tend to predominate over individual issues.  Defendants, for their part, believe that if a class is certified, the litigation will become bogged down with the need to conduct numerous individual inquiries into the facts.  For example, Defendants believe each class member will need to be asked why he or she sought treatment at one medical facility, as opposed to another; what he or she understood the Admission Form to mean; and whether he or she relied on any particular advertisements made by the Hospital regarding how health insurance would be billed.  The Court observes that Defendants are aware that their billing and lien policy as to car-accident victims was applied uniformly to all class members, and that the Hospital requested and documented each class member's health insurance coverage at the time they presented for treatment.  Furthermore, Defendants have admitted that, according to their billing practice, they declined to file claims for coverage against class members' health insurance policies and instead filed liens against their tort claims.

Because this billing policy appears to have been applied in the same way to all class members, the Court finds that class issues will predominate over individual issues in this case.  If Defendants' billing practice is ultimately determined to be illegal, very few

individual inquiries will be needed, as all class members could simply be asked whether they paid the Hospital's liens because they assumed them to be valid.  If they did, then this would be evidence that they were misled or deceived in violation of the ADTPA.  If, on the other hand, any class members claimed they knew the liens were invalid, yet paid them regardless, the Court could envision a need for further individualized inquiry, especially with respect to the voluntary payment defense.[14]  To the extent Defendants believe that the existence of this defense as applied to individual class members would be sufficient to defeat class certification, the Court disagrees.  "[E]ven though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members," a class action will still meet the requirements of Rule 23(b)(3) "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate."  *Tyson Foods, Inc. v Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal quotation and citation omitted).

Defendants also contend that litigating the tortious interference claim on a class-wide basis will require an individualized inquiry as to whether each class member was validly covered by health insurance during the relevant time period and suffered an injury due to Defendants' policies and practices.  The Court, again, finds this argument to be a non-starter, as Defendants have already produced a list of potential class members and their insurance providers.  It should be a simple, mechanical process to establish whether each member was, in fact, covered by insurance at the time of treatment—if indeed this inquiry has not been made yet by Defendants.  Each insurer could be provided with a list

---

[14]  But to reiterate, the Court does not believe that the voluntary payment defense would apply against the ADTPA claim.  *See supra*, Section III.A.1.a..

of insureds and asked to verify that a valid health policy was in effect as to each individual during the treatment date(s) specified.

As for the class's claim for unjust enrichment, the Court is similarly unpersuaded that individualized inquiry will make management of the class too difficult. It is possible to calculate the amount of unjust enrichment on a class-wide basis by noting the invalid lien amounts that were actually paid by class members. Accordingly, the predominance requirement is satisfied.

### b. Superiority

The second and final factor to consider in the Rule 23(b) analysis is whether a class action is a superior means of resolving this dispute as compared to other litigation methods. According to the Supreme Court, the "principal purpose" of a class action is to advance "the efficiency and economy of litigation." *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974). In this regard, Rule 23 class actions may be viewed as having been created as a management tool to make litigation easier, not more complicated. Ms. Mounce points out that there are around 850 identified class members with similar facts, similar claims for damages, and similar questions of law and fact to resolve. Because all of these claims hinge upon a common billing and lien practice that Defendants implemented, and because each claim for damages is likely similar in terms of dollar-value, it would be more efficient to group the claims into one class action than manage hundreds of separate lawsuits, each for a relatively small amount of damages. The Court also finds it likely that putative class members may be dissuaded from filing individual actions, as the amount of damages in each case could make the cost-benefit analysis inherent in litigation weigh against filing suit. For these reasons, the superiority requirement is met.

# IV. CONCLUSION

In light of the above discussion, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 44) is **DENIED**, and Plaintiff's Motion for Class Certification (Doc. 42) is **GRANTED**.

**IT IS FURTHER ORDERED** that the certified class is defined as follows:

All Arkansas residents who, since April 30, 2010, received any type of healthcare treatment from any entity located in Arkansas that is owned, controlled, managed and/or affiliated with Defendants, and: (i) such treatment was covered by valid, in network, commercial health coverage; (ii) the billing charges regarding such treatment were not timely submitted to the commercial health carrier; and (iii) Defendants obtained payments for such treatment as a result of asserting third-party medical liens, submitting claims for medical payments coverage, and/or seeking payment directly from the patients.

**IT IS FURTHER ORDERED** that Plaintiff Jessica Mounce is designated as Class Representative.

**IT IS FURTHER ORDERED** that, in consideration of the affidavits and CVs that were attached to Plaintiff's Motion for Class Certification, and in light of Defendants' lack of objection to Plaintiff's attorneys serving as Class Counsel, the Court designates the following attorneys to represent the class: Jason W. Earley, Mitchell Burgess, Ralph Phalen, Shawn B. Daniels, and Sarah Coppola Jewell.

**IT IS FURTHER ORDERED** that no later than **October 31, 2017**, Class Counsel must submit a motion for approval of a proposed plan of notice and the proposed notice forms, in accordance with Rule 23(c)(2)(B). According to the Rule, the proposed notice should be "the best notice that is practicable under the circumstances" and should "clearly

and concisely state in plain, easily understood language" all the information set forth at subsection (c)(2)(B)(i)-(vii).

**IT IS SO ORDERED** on this 29th day of September, 2017.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE